# Richmond

## M. Osborne Jones v. Haskins Hobson, et als.

October 11, 1943.

Record No. 2695.

Present, Campbell, C. J., and Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*Williams, Mullen & Hazelgrove* and *Ralph T. Catterall*, for the appellant.

*John B. Lightfoot, Jr.*, for the appellees.

CAMPBELL, C. J., delivered the opinion of the court.

This controversy involves the ownership of five thousand shares of the common stock of the Duplex Envelope Company, a corporation chartered under the laws of the Commonwealth of Virginia, with its principal office in the city of Richmond.

At the first January Rules, 1941, appellant, M. Osborne Jones, who is a stockholder in the Duplex Envelope Company, Inc., filed his bill of complaint against appellees, Haskins Hobson, John T. Wingo, W. S. Pinder, J. E. Sadler, Robert Hopper, and others constituting the board of directors of the corporation. The specific allegation of the bill is that appellees are illegally seeking to deliver to J. E. Sadler 5,000 shares of the common stock of the corporation, and it prays that, upon final adjudication, appellant be awarded an injunction restraining and enjoining appellees from issuing and delivering to him the said stock, pursuant to the action taken by the board of directors at a meeting held on the 18th day of September, 1940.

The cause was heard upon the bill of complaint, the answers of the defendants and the depositions of witnesses. The court being of opinion, for reasons stated in writing, that appellant failed to establish the allegations of his bill, entered a decree denying the injunction prayed for and awarding to J. E. Sadler, as the true owner, the shares of stock in controversy.

From that decree this appeal was allowed.

The facts pertinent to the issue are as follows:

Duplex Envelope Company, Inc., is a manufacturer of the duplex envelopes used primarily by churches and banks, and for a period of years was a successful concern. Its stock ownership and management was originally closely confined to the family of its founder, Archer Jones, the father of appellant.

Prior to the year 1933, the corporation became so financially involved that on July 11, 1933, in order to prevent foreclosure proceedings by the holders of its bonded indebt-

edness, it was placed in the hands of receivers by an adjudication of the Law and Equity Court of the City of Richmond. Appellant, who at that time was president of the corporation, was appointed one of the receivers and, as such, operated the corporation for approximately three years.

The financial affairs of the corporation steadily became worse and to prevent a foreclosure by the bondholders, under the terms of a deed of trust, appellant, as president of the corporation, filed its petition in bankruptcy in the District Court of the United States for the Eastern District of Virginia, seeking a reorganization of the corporation under the provisions of sections 77A and 77B of the National Bankruptcy Act. The proposed plan of reorganization was agreed to and approved by all the creditors of the corporation, by all its stockholders, by counsel for the trustees and by appellant, Jones. Following this full accord, the plan of reorganization was confirmed by the bankruptcy court on June 15, 1936, and finally became effective on March 1, 1937.

Section XII, paragraph 1, and section XIV, paragraphs 1 and 3, of the plan, provide for the management of the corporation. These sections provide for seven voting trustees and seven directors, including the president, who are to be named by the voting trustees.

Appellees Hobson, Wingo and Pinder were the directors named by the majority group of voting trustees, and Justin Moore, Sherlock Bronson and A. R. Bowles were named by the minority group of voting trustees. However, prior to the completion of the reorganization plan, being of opinion that the affairs of the corporation should not again be committed to appellant, Messrs. Hobson and Wingo contacted J. E. Sadler (then in the employ of Bauer and Black, a manufacturing company of Chicago). Sadler was a former resident of Richmond, a graduate of Hampden-Sydney College, with the degree of Bachelor of Science, and a holder of the degree of Master of Business Administration from Harvard University. During his connection with Bauer

and Black he was instrumental in the rehabilitation of that company.

At the request of Hobson and Wingo, Sadler came to Richmond to investigate the proposal that he become a co-trustee and executive head of the corporation. As a result of the interview with Hobson and Wingo, Sadler agreed to undertake the rehabilitation of the corporation, but with certain provisos. These were: He was to receive an initial salary of $6,000 per annum, and an appreciable amount of stock in the corporation was to be delivered to him in order that his future interest in the corporation would be protected against any change of control under section XIV, 3, (f), of the said plan.

Thereupon, Hobson and Wingo agreed with Sadler that they would recommend for inclusion in the plan for reorganization two stipulations, to-wit, a minimum salary of $6,000, and the setting aside of 5,000 shares of the common stock of the corporation, to be awarded to him after the lapse of a period of two years, as additional compensation for his services in the rehabilitation of the corporation. The fact that appellant was cognizant of the inclusion of these provisions is evidenced by his signature, as president, attached to the Plan for Reorganization.

As section XVIII of the Plan of Reorganization is the crux of the case, it is set forth in its entirety:

### "SECTION XVIII.

*"Executives of Reorganized Company, and disposition of 15,000 shares of Common Stock.*

"1. The reorganized Company will employ J. E. Sadler as President from the date the plan and reorganization become effective, at a salary of the rate of not less than $6,000.00 per year, to hold office at the pleasure of the Board of Directors of the Company.

"2. The reorganized Company will employ M. Osborne Jones as Vice-President from the date the plan and reor-

ganization become effective, to January 1, 1939, at a salary of the rate of not less than $6,000 per year.

"3. When all of said Sinking Fund Notes have been purchased or paid, and all of said First Preferred Stock, of both series, has been purchased or redeemed, or otherwise acquired by the Company, 10,000 shares of said 15,000 shares of new Common Stock to remain unissued upon the reorganization as hereinbefore provided, will be issued to said M. Osborne Jones, and will be delivered to him, or to his personal representatives, successors or assigns, as additional compensation for his services to and in the rehabilitation of the Company.

"4. In the discretion of the Board of Directors at any time after two years from the date the plan and reorganization become effective, the remaining 5,000 shares of said 15,000 shares of new Common Stock to remain unissued upon the reorganization as hereinbefore provided, or any part of said 5,000 shares, may be awarded by the Board of Directors and issued to J. E. Sadler, and to any other of the officers or employees of the reorganized Company, or to any one or more of them as the Board may determine, as additional compensation for services rendered in the rehabilitation of the Company; but if any of said 5,000 shares are awarded by the Board of Directors before all of said Sinking Fund Notes are purchased or paid and all of said First Preferred Stock of both series, or voting trust certificates therefor, have been purchased or redeemed, or otherwise acquired by the Company, such stock shall be issued and registered in the names of the Voting Trustees instead of in the name of the person or persons to whom it is awarded, and will be delivered to and held by the Voting Trustees under said voting trust agreement until all of said Sinking Fund Notes have been purchased or paid and all of said First Preferred Stock of both series, or voting trust certificates therefor, have been purchased or redeemed, or otherwise acquired by the Company, and for which the Voting Trustees will issue voting trust certificates to the person or persons entitled thereto under the

award. If any or all of said 5,000 shares are not awarded before the termination of the voting trust agreement, they will be available for sale or other disposition for the general corporate purposes of the Company.

"DUPLEX ENVELOPE COMPANY, INCORPORATED,
"by M. Osborne Jones,
"President."

"June 15, 1936.
Wirt P. Marks, Jr.,
Richmond, Virginia,
Counsel for Debtor."

On March 1, 1937, Sadler became president of the corporation and *ex officio* a director thereof.

In the exercise of the discretion provided by paragraph 4, section XVIII, of the plan, by resolution adopted at a meeting held (after due notice), on September 18th, a majority of the board of directors awarded the 5,000 shares of stock to J. E. Sadler. Through inadvertence, the resolution adopted did not include a stock valuation clause as required by section 3788 of the Code of Virginia. This omission was remedied by resolution adopted at a special meeting held on the 28th day of December, 1940, by a reaffirmance of the action taken at the meeting held on September 18, 1940. The valuation placed upon the stock at this meeting was the sum of $5,500.

It is the contention of appellant: (1) That the action of the board of directors on September 18, 1940, in awarding the stock to Sadler, was unlawful and void, for the reason that the notice of meeting was inadequate and insufficient, and illegally called and held; (2) that Sadler had been fully compensated by payment of his salary; (3) that the action of the board of December 28, 1940, assigning a value to services for which the stock was to be issued, was effected by means of an unlawful scheme pledging director Hopper to cast his vote for the resolution; (4) that the value of the

stock awarded was $61.00 a share and, therefore, grossly in excess of the value of the services rendered by Sadler.

A number of cases are cited by appellant which set forth the rule of law governing the conduct of corporate affairs. Since we are of opinion that a proper decision of the case turns upon questions of fact, we deem it unnecessary to discuss the alleged legal phase of the case.

While the record, consisting of 305 printed pages, is replete with acrimonious charges and countercharges, the sole question involved is this: Has the appellant, by preponderating proof, established a case entitling him to injunctive relief?

It would serve no good purpose to enter upon a detailed discussion of the evidence adduced. The learned trial court, in denying the prayer of the bill of complaint, had this to say:

"Since the argument of this case on October 6th, I have carefully read and considered the briefs presented by counsel and all of the evidence and exhibits and have concluded that the complainant has not factually established his case and is not entitled to relief prayed for. I am of opinion that the Directors' meetings held on September 18th, December 18th and December 28th, 1940, respectively, were legally called and held, as was likewise the meeting of the Voting Trustees on December 18th. I am further of opinion that the complainant has failed to establish that the Directors abused their discretion in voting and awarding to J. E. Sadler, under the provisions of Article 4, Section XVIII of the Plan of Reorganization, the 5,000 shares of stock therein mentioned. Nor has complainant shown that the awarding of such stock was made under sufficient mistake of fact or misconception of the existing circumstances on the part of one of the affirmatively voting directors as to warrant such action being set aside by a court of equity.

"While the complainant has not prevailed in this cause and ordinarily the costs might be decreed against him, I have determined that the circumstances of this case, as well as the interest and rights of the several parties to this cause,

are such as to render it proper that the costs herein, including the charges for stenographic report of the depositions, be paid by the defendant corporation."

A very careful examination of the record leads us to the same conclusion and we, therefore, adopt the view expressed by the trial court.

The decree appealed from will be affirmed.

*Affirmed.*